## LICENSE AGREEMENT

This Agreement entered into this 6 day of November, 2016 ("Agreement") replaces in its entirety and supersedes the Agreement entered into July 20, 2015 ("7/20/15 Agreement") by and between McCUBBIN HOSIERY, LLC, an Oklahoma limited liability company, 5310 N.W. 5th Street, Oklahoma City, Oklahoma 73127 ("Licensee") and TIMES THREE CLOTHIER LLC, a New York limited liability company, 530 7th Avenue, Suite 1505, New York, New York 10010 ("Company").

1. Engagement. Company hereby engages Licensee as its exclusive wholesale distributor in the United States and Canada to Retailers as defined in this Agreement and in Mexico only to Costco (collectively "Territory") of women's products listed on Exhibit A ("Products") carrying the Company's trademark Yummie by Heather Thomson ("Trademark") to the retailers listed on Exhibit B, including but not limited to Full Price Retailers, Independent Specialty Store Retailers, Club Retailers and Off Price Retailers (collectively, the "Retailers").

2. Manufacturing, Marketing & Sales Duties. The Licensee shall be solely responsible for the manufacturing, marketing and sales of the Products.

    a. Licensee may manufacture the Products anywhere in the world, provided that the Licensee, its suppliers, contractors, sub-contractors and agents at all times fully comply with the laws, rules and regulations of the countries where the Products are being manufactured. Licensee will carefully monitor such compliance.

    b. Licensee shall submit to the Company for its prior written approval samples of any Products that the Licensee wishes to manufacture for sale. The Company shall not unreasonably withhold its approval and shall provide such approval or rejection with specific comments within 10 days of receiving any samples from the Licensee. If the Company fails to respond within 10 days of receiving any samples, then those samples shall be deemed approved.

    c. All Products manufactured by the Licensee shall be substantially identical in quality, construction and appearance to the samples approved by the Company.

   d. Licensee shall submit to the Company for its prior written approval the usage, placement and exact size of the Licensee's intended use of the Trademark on the Products, including the packaging for the Products, as well as any marketing or promotional materials which the Licensee wishes to use or which the Retailers wish to use with respect to the Products. The Company shall provide such approval or rejection with specific comments within 10 days of receiving any samples from the Licensee. If the Company fails to respond within 10 days of receiving any samples, then those samples shall be deemed approved. All production by Licensee shall be substantially identical in quality, construction and appearance to the samples approved by the Company.

   e. Licensee acknowledges that the Company has sole ownership of the Trademark and that the Licensee's right to use the Trademark is derived solely from this Agreement. The Company has received registration #4553312 for the Trademark and #4126770 for the Trademark and a design from the U.S. Patent and Trademark Office and registration # TMA938171 from the Canadian Intellectual Property Office for the trademark. The Company represents that there it is not aware of any disputes or claims by any third party that asserts any ownership interest in the Trademark in the Territory.

   f. Licensee shall use its best efforts to sell the Products in the Territory. In order to do so, the Licensee will provide a dedicated sales manager to sell the Products and maintain a separate display area for the Products in its showrooms.

3. <u>Term.</u> The initial term of this Agreement shall be from July 20, 2015 through December 31, 2019. The First Year shall be through December 31, 2016; the Second Year shall be from January 1, 2017 through December 31, 2017, the Third Year shall be from January 1, 2018 through December 31, 2018, and the Fourth Year shall be from January 1, 2019 through December 31, 2019. Provided the Licensee's Net Sales (as hereinafter defined in Section 4) to all Retailers (as defined in Exhibit A) in the Third Year exceed $1.3 million , then Licensee shall have the right to renew this Agreement for three more years ("Renewal Term") by providing the Company with written notice by January 31, 2019. Each year of the Renewal Term shall be identified as the

Fifth Year, Sixth Year and Seventh Year. Any year of the Initial Term or the Renewal Term shall be referred to as a Term Year.

4. Royalties & Marketing Fees. The Royalties and Marketing Fees to be paid by the Licensee to the Company shall be as follows based on the Net Sales of Licensee to the Retailers. Net Sales shall be defined as the amount Licensee bills the Retailers for all Products, less returns, trade discounts and markdown allowances granted by the Licensee to the Retailers.

| Retailers | | Royalties | Marketing Fees |
|---|---|---|---|
| Full Price Retailers and Independent Specialty Store Retailers | 9% | 2% | |
| Club Retailers | 7% | 2% | |
| Off Price Retailers | 6% | 2% | |

5. Guaranteed Royalties and Guaranteed Marketing Fees. The Licensee agrees to the following:

   a. To pay the Company Guaranteed Royalties of $57,850 and Guaranteed Marketing Fees of $12,860 for Net Sales to Full Price Retailers and Independent Specialty Store Retailers only for the First Year, which shall be by payments of $17,682 by August 5, 2015, $26,524 by July 31, 2016 and $26,524 by January 31, 2017.

   b. To pay the Company Guaranteed Royalties and Guaranteed Marketing Fees as detailed below for Net Sales to all Retailers for the Second Year, Third Year and Fourth Year:

| Term Year | Guaranteed Royalties | Guaranteed Marketing Fees |
|---|---|---|
| Second Year | $85,500 | $19,000 |
| Third Year | $123,300 | $27,400 |
| Fourth Year | $123,300 | $27,400 |

   i. For the Second Year, the payments shall be in four equal installments of $26,125 on April 30, 2017, July 31, 2017, October 31, 2017 and January 31, 2018.

  ii. For the Third Year and Fourth Year, the payments shall be in four equal installments each year of $37,675 on April 30, July 31 and October 31 of the Term Year and January 31 of the following year.

 c. If the Licensee exercises the Renewal Term, Licensee agrees to pay the Company the Guaranteed Royalties and Guaranteed Marketing Fees detailed below for Net Sales to all Retailers:

| Term Year | Guaranteed Royalties | Guaranteed Marketing Fees |
|---|---|---|
| Fifth Year | 15% more than (i) Royalties due for Net Sales to all Retailers for the Third Year, (ii) Royalties due for Net Sales to all Retailers for the Fourth Year or, (iii) Guaranteed Royalties for the Fourth Year, whichever is greatest. | 15% more than Marketing Fees due for Net Sales to all Retailers for the Third Year, (ii) Marketing Fees due for Net Sales to all Retailers for the Fourth Year, or (iii) Guaranteed Marketing Fees for the Fourth Year whichever is greatest. |
| Sixth Year | 5% more than the Guaranteed Royalties for the Fifth Year | 5% more than the Guaranteed Marketing Fees for the Fifth Year |
| Seventh Year | 5% more than the Guaranteed Royalties for the Sixth Year | 5% more than the Guaranteed Marketing Fees for the Sixth Year |

 c. The Guaranteed Royalties and Guaranteed Marketing Fees for each Term Year of the Renewal Term shall be paid in four equal installments on April 30, July 31, October 31 of the same year and January 31 of the following year.

d.

6. <u>Statements and Payments of Royalties and Marketing Fees.</u> For each Term Year by April 30, July 31, October 31 of that Term Year and on January 31 of the following year, the Licensee shall submit to the Company a detailed report of its Net Sales ("Statement") for the period of the Term Year ending March 31, June 30, September 30 and December 31 respectively. Each Statement shall list the Net Sales broken down by Full Price Retailers, Independent Specialty Store Retailers, Club Retailers and Off Price Retailers by product category and style showing the returns, trade discounts and markdown allowances granted to each of the Retailers and a calculation of the Royalties and Marketing Fees due for the period, which Royalties and Marketing Fees the Licensee shall pay by wire transfer to the Company on the date each Statement is due. For Net Sales in Canada, each Statement shall show the Net Sales in Canadian dollars and in U.S. dollars based on the conversion rate on the last day of the period that the Statement covers.

   a. If the Royalties and Marketing Fees due and paid for a Term Year or any portion thereof exceed the Guaranteed Royalties and Guaranteed Marketing Fees paid for the same Term Year or any portion thereof, the payments due for Royalties and Marketing Fees for the same term year or portion thereof shall only be the excess amount after offsetting the Guaranteed Royalties and Guaranteed Marketing Fees paid.

   b. If the Royalties and the Marketing Fees due and paid for a Term Year or any portion thereof exceed the Guaranteed Royalties and the Guaranteed Marketing Fees due for the same Term Year or any portion thereof, Licensee shall not have to pay the Guaranteed Royalties and the Guaranteed Marketing Fees for the same Term Year or any portion thereof.

   c. If the Guaranteed Royalties and the Guaranteed Marketing Fees paid for any Term Year or any portion thereof exceed the Royalties and Marketing Fees due for the same Term Year or any portion thereof, no Royalties and Marketing Fees shall be due.

   d. Notwithstanding the above, for the Second Year, if the Royalties and Marketing Fees due for Net Sales to Full Price Retailers and Independent Specialty Store Retailers are less than $44,000, then by January 31, 2018, the Licensee shall pay the Licensor the difference

between $44,000 and the Royalties and Marketing Fees due for Net Sales to Full Price Retailers and Independent Specialty Store Retailers for the Second Year, except that no such payment shall be required if for the Second Year the Royalties and Marketing Fees for Net Sales to all Retailers paid by the Licensee to the Licensor are at least $130,000.

e. Notwithstanding the above, for the Third Year or Fourth Year, if the Royalties and Marketing Fees due for Net Sales to Full Price Retailers and Independent Specialty Store Retailers are less than $55,000, then by January 31 of the following year, the Licensee shall pay the Licensor the difference between $55,000 and the Royalties and Marketing Fees due for Net Sales to Full Price Retailers and Independent Specialty Retailers for the Third Year or Fourth Year, except that no such payment shall be required if the Royalties and Marketing Fees for Net Sales to all Retailers for the same year paid by the Licensee to the Licensor are at least $188,000.

7. Payments & Records. All payments due from the Licensee to the Company shall be made in U.S. dollars by wire transfer to the following Company account or to such other bank account designated by the Company in writing.

   Bank Name: JP Morgan/Chase
   ABA: 021000021
   Beneficiary Account #: 801158981
   Beneficiary Name: Times Three Clothier, LLC

   a. All payments not made on the due date shall bear interest at the rate of one percent (1 %) per month, or at the higher percentage allowed by law applicable to commercial loans, if such rate is lower, effective on the date that such sum was due until the date on which such sum is paid in full.

   b. The Licensee shall keep full and accurate books, records and accounts covering all sales, returns, trade discounts and markdown allowances relating to the Products. The Company or its representative shall have the right once per year upon, giving the Licensee 15 days advance written notice, to audit such books and records of the Licensee for the Products. Within 10 days of receiving the Company's audit report, the Licensee shall pay the Company any unpaid Royalties and Marketing Fees due and owing plus interest thereon at the rate and

November 2, 2016
EAST\136675270.1

6

for the period of time as set forth in Section 5 (a). If the unpaid amount is 5% or more than the Royalties and Marketing Fees paid by the Licensee, the Licensee shall immediately reimburse the Company for its audit fees and expenses. If a Company audit reveals a shortage of 5% or more for a second time, the Licensee shall be in breach of this Agreement and the Company may immediately terminate this Agreement.

8. <u>Dollar Amounts.</u> All dollar amounts referred to in this Agreement are U.S. dollar amounts and not Canadian dollar amounts.

9. <u>Confidentiality.</u> The Licensee and the Company agree to keep confidential all proprietary and business information received from the other including all terms and conditions of this Agreement. Information made publicly available by either party or information that a party is required by applicable law to disclose shall not be deemed confidential. This section shall survive the expiration or termination of this Agreement.

10. <u>Indemnification and Insurance.</u> Licensee agrees that it is wholly responsible for all Products and that the Company shall have no liability for any of the Products as to their compliance with government regulations, manufacturing, marketing, sales or performance.

    a. Licensee shall indemnify, defend and hold harmless the Company, its officers, directors, employees and agents, and their respective successors, heirs and assigns against any liability, damage, loss or expense (including reasonable attorneys' fees and costs) incurred by or imposed upon any of the above persons in connection with any claims, suits, actions, demands or judgments arising out of or resulting from the Products or any activities of the Licensee.

    b. Licensee shall obtain and carry in full force and effect during every Term Year commercial general liability insurance, including product liability insurance to cover the Products. The limits of such insurance shall be not less than $2 million per occurrence with an aggregate of not less than $4 million for bodily injury including death or for property damage. Licensee shall provide the Company with a certificate of insurance naming the Company as an

additional insured, providing that the Company must receive 30 days advance written notice of the expiration or termination of any such insurance.

11. <u>Breach.</u> If Licensee fails to timely and properly perform any of its obligations under this Agreement, the Company may advise the Licensee in writing of the specific non-performance and immediately terminate this Agreement, with all Royalties, Marketing Fees, Guaranteed Royalties and Guaranteed Marketing Fees becoming immediately due and payable 10 days after the Licensee has received the termination notice. In the event of any such termination, the Licensee must, within 10 days of receiving the termination notice, provide the Company with a detailed inventory, broken down by sold and unsold Products in its possession or in work, listed by style, color, size and number of units. Provided the Licensee furnishes this detailed inventory and makes all the payments due within 10 days of receiving the termination notice, the Licensee will have 120 days from receiving the termination notice to sell and ship all Products subject to all of the other terms and conditions of this Agreement. Any Products not sold at the end of the 120 day period will immediately be destroyed by the Licensee, and the Licensee must provide the Company within 130 days of the termination notice with a letter certified by its Chief Financial Officer identifying in the same detail as the required inventory the Products that were destroyed.

12. <u>Governing Law.</u> This Agreement has been entered into in the State of New York and the validity, interpretation and legal effect of this Agreement shall be exclusively governed by the laws of the State of New York. The New York courts in New York County only shall have exclusive jurisdiction and exclusive venue over any and all disputes regarding or arising out of this Agreement. Service of process, of any court action may, in addition to any other permitted means of service of process be served upon a party by the other party by delivering it or mailing it, by registered or certified mail, direct to the address first above written or such other address as a party may designate from time to time in writing. Any such delivery or mail service shall be immediately effective and shall be deemed to have the same effect as if the process were personally served within the State of New York. The Licensee acknowledges that the Company may pursue injunctive relief besides monetary damages if the Company believes failure of the Licensee to comply with the terms and conditions of this Agreement may cause or is causing

irreparable harm and injury to the Company. If any litigation arises between the parties, the substantially prevailing party shall be entitled to collect its reasonable attorneys' fees and costs from the losing party.

13. <u>Notice</u>. Any notice to be given under this Agreement shall be deemed effective by personal delivery, by mail registered or certified postage pre-paid, return receipt requested, by Federal Express or other air carrier requiring a signature acknowledging receipt, or by electric mail with confirmed delivery. Notices shall be sent to a party at its address set forth above or any other address provided in writing by a party.

14. <u>Assignment</u>. The Licensee shall not be entitled to assign this Agreement in whole or part without the prior written consent of the Company.

15. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement. A facsimile, photocopy or email scanned copy of the signed Agreement shall be deemed to be an original.

16. <u>Entirety</u>. This Agreement constitutes the entire agreement between the parties. If any provision of this Agreement is deemed by a court of law to be unenforceable, the remaining provisions of this Agreement shall remain in full force and effect. No amendments or modifications may be made unless in writing and signed by both parties.

17. This Agreement supersedes and replaces in its entirety the 7/20/15 Agreement.

MC CUBBIN HOISERY, LLC

By: _____

(name, title)

DAVID McCUBBIN
PRESIDENT

TIMES THREE CLOTHIER, LLC

By: _____

(name, title)

ERIC POTTIMO
Managing Member

November 2, 2016
EAST\136675270.1

9

## EXHIBIT A

## PRODUCTS

Product categories

Athletic socks

Casual socks

Dress socks

Lounge socks

Cozy socks

Cabin socks

Non-Shaping and Shaping basic tights with toe closures

Non-Shaping and Shaping fashion tights with toe closures

Slippers/Slipper Socks

<u>EXHIBIT B</u>

<u>RETAILERS</u>

<u>Full Price Retailers</u>

Bloomingdales
Dillards
Lord & Taylor
Von Maur
Nordstroms
Saks
Belk
Amazon
Zappos
Shopbop
HSN

<u>Independent Specialty Store Retailers</u>

Independent Specialty Store Retailers that sell the Company's clothing under the Trademark. Other Independent Specialty Store Retailers, for which the Licensee must submit any proposed orders to the Company for its prior written approval. The Company in its sole discretion may approve or not approve orders such additional Independent Specialty Store Retailers.

<u>Club Retailers</u>

<u>Costco</u> in the United States, Canada and Mexico

For any other retailers operating as membership clubs, the Licensee must submit any proposed orders to the Company for its prior written approval. The Company in its sole discretion may approve or not approve orders for Club Retailers other than Costco.

<u>Off Price Retailers</u>

Nordstroms Rack
Saks Off Fifth          steinmart (added to OP retailer list per Eric email on 8/31/2017 6:11PM)
Bloomingdales Outlet
Marmaxx
Century 21
Ross Stores
Gilt Groupe
Rue La La
Haute Look
DSW
Burlington Coat
Sierra Trading Post
Zulily

November 2, 2016                                                                                                   11
EAST\136675270.1

FIRST AMENDMENT TO LICENSE AGREEMENT

This First Amendment entered into this _20·th_ day of March, 2018 ("First Amendment") amends the License Agreement entered into on November 28, 2016 ("Agreement") by and between McCUBBIN HOSIERY, LLC and TIMES THREE CLOTHIER, LLC.

1. The second sentence of Section 4 is replaced in its entirety by the following:

Net Sales to Full Price Retailers, Independent Store Retailers and Off Price Retailers shall be defined as the amount Licensee bills such Retailers for all Products, less returns, trade discounts and markdown allowances granted by the Licensee to such Retailers. Net Sales to Club Retailers shall be defined as the amount Licensee bills Club Retailers for all Products, less returns, end cap, fence or other in store displays, coupon support, advertising charges, defective allowances, price protection and markdown allowances granted by the Licensee to Club Retailers.

2. This Amendment shall apply to all Licensee Net Sales in 2017.

3. All capitalized terms in this Amendment shall have the same definitions as in the Agreement.

4. Except as modified by this Amendment, the Agreement remains unchanged.

5. This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. A facsimile, photocopy or email scanned copy of this Amendment shall be deemed to be an original.

MC CUBBIN HOSIERY, LLC

BY: _____

(NAME, TITLE,)
DAVID McCUBBIN
President

TIMES THREE CLOTHIER, LLC

BY: _____

(NAME, TITLE)
Eric A. Rothfeld
CEO